YELVERTON, Judge.
South Central Bell Telephone Company, the appellee, wrongfully suspended its telephone services to Standard Fittings Company, appellant, for four days in 1969, causing a loss of net business revenue which the trial court found amounted to $1,320. From a judgment in its favor for this amount, Standard Fittings Company appeals, urging the award was inadequate. We affirm.
Standard, a manufacturer and distributor of forged steel pipe fittings, in 1969 had a factory in Opelousas, Louisiana, having relocated from Massachusetts the previous year. On January 20, 1969, Southern Bell disconnected the plaintiff’s phones due to nonpayment of the bills. Before the disconnection, representatives from Southern Bell had been notified that plaintiff had filed Chapter XI bankruptcy proceedings. The Bankruptcy Court on January 16,1969, had issued an order enjoining anyone from disconnecting any utilities including telephone services. The telephone company did not fully reconnect the phone service until January 24, 1969. When Southern Bell reconnected the plaintiff’s phone service, plaintiff did not receive its old numbers, but instead received new numbers. When customers attempted to call the old numbers, the telephone operators would not refer the customers to the new numbers, but would tell them only that the phones had been disconnected. Several witnesses testified that operators informed them that the plaintiff had gone out of business.
The sole issue raised on appeal is the adequacy of the award of $1,320 for the resulting business loss. In its reasons for judgment the trial court found that plaintiff suffered a net revenue loss in 1969, and that defendant’s wrongful conduct in disconnecting the phone service was a cause in fact of part of that loss, but only a relatively small part of it. The loss caused by defendant’s conduct was, in the trial court’s words:
“an additional $1,320, in net revenues in 1969 (Vioth of $13,200 loss in net income which Mr. Stout determined was not reflected by the previous trend in income or loss).”
In the process of explaining our reasons for affirming the adequacy of this award, we will discuss the testimony of the various witnesses, including that of Mr. Stout, whose analysis the trial court obviously believed was the most reliable.
Standard’s president, Irvin Davlin, testified on its behalf that prior to the phones being disconnected the company was not *1146 having difficulty in making sale arrangements and agreements with its customers. After the phones were cut off Standard was no longer recognized as a steady, reliable source of products. After the reconnection Standard contacted its customers by telephone and by letters to notify them of its new numbers. However, incoming orders continued to drop and stayed at a lower level. This situation prompted him to lower Standard’s prices on goods by an average of 15 percent lower than their former prices before the disconnection, in an attempt to secure a more competitive place in the market. However, sales continued to be at a lower level. In 1969 Standard began to suffer from a serious cash flow problem due to the drop in sales. The company lowered its inventory to develop more cash flow. This resulted in delays in shipment to its customers. Mr. Davlin admitted that there were delays in shipments also in 1968, but said that these delays were caused by the problems in relocating the plant from Massachusetts to Louisiana. Mr. Davlin testified that the Chapter XI proceedings had nothing to do with the drop in sales, and that his company suffered a $610,326 loss in profits as a result of the phones being shut off.
John O’Donnell, the administrative assistant to Mr. Davlin and the company financial analyst, testified that Standard’s average monthly sales during the 16 month period prior to the disconnection was $211,-000. Using the conservative figure of $200,000 a month average to formulate the anticipated sales volume for 1969, and then subtracting the actual sales revenue made in 1969 from this figure, he calculated that Standard suffered a $531,593.37 loss in sales during 1969. Then subtracting the cost of manufacturing expenses, material, and administrative and selling costs, he testified that Standard suffered a $250,327 loss in sales profits as a result of lost sales. He also stated that Standard suffered a $359,999 loss as a result of lowering its price on products by an average of 15 percent in 1969. Accordingly, he estimated Standard’s total loss during 1969 was $610,326. He also stated that a Chapter XI proceeding would have an effect on the cash flow and the people who purchase a product.
John Domingue, Standard’s comptroller, said that prior to 1969, Standard was able to adequately fill orders and to buy raw material. The company suffered a decline in funds after the phones were disconnected. The company completed its relocation to Louisiana in the summer of 1968.
Another Standard employee, Malcolm Marcus, who was ⅛ charge of inventory, raw materials, and quality control, stated that at times the company suffered from lack of supplies and raw materials due to a lack of cash flow in both 1968 and 1969. In 1968 the company had some trouble filling big orders due to lack of materials, breakdown of machinery, and the absence of operators. He stated these problems continued in 1969.
A former Standard sales representative, John Connell, testified that when the phones were disconnected numerous customers contacted him and wanted to know if Standard was out of business. At the time he could not give the customers a referral number, and he was unable to place their orders. He felt this gave the company a bad image and he spent a lot of time answering questions and explaining the situation to customers.
Southern Bell called a number of witnesses to show that the damages suffered by Standard as a result of the phones being disconnected were minimal.
Shelton Courville, a former administrative assistant to Mr. Davlin, Standard’s president, testified the company was having problems purchasing materials, producing goods, and maintaining quality control before filing Chapter XI proceedings in January 1969. The disconnecting of the phones did affect sales a little, but Standard did not lose any major contracts which were a major portion of its business. After the phones were reconnected Standard notified its customers it was still in business. He had no knowledge of Standard losing any customers as a result of the phones *1147 being disconnected. Sales did drop during the time the phones were disconnected; however, this lasted only until the phones were reconnected and the customers contacted. He estimated that only 10 percent of the sales drop was attributable to the phones being disconnected. Mostly only small orders were done by phone. He opined that the bankruptcy proceeding hurt the business because the customers no longer felt Standard was a dependable supplier. The drop in volume of sales after the Chapter XI proceedings was a result of the poor quality of product and the inability of Standard to supply products to the customers. The disconnection of the phones had no effect on this aspect of the business. The volume of sales was also dropping before the bankruptcy proceedings due to poor quality and inability to service accounts and obtain raw materials.
Ramona Wyble, another former Standard employee in the sales department, testified that Standard was having quality control problems and non-availability of finished products in 1968. The problems increased after the company filed Chapter XI proceedings. The customers would be furious over the delay of shipment. The telephones being disconnected affected the telephone sales 10-15 percent for no more than two weeks. However, the bulk of Standard’s business was the large jobbers. She had no knowledge of any customers being lost as a result of the disconnected phones. When they received their new phone numbers the sales representatives contacted the customers. The in-house staff contacted the large jobbers. Standard in both 1968 and 1969 was having problems filling customers’ orders. It had a large backlog of orders which could not be filled. It took nine to 12 months to fill a large order. The phones being cut off did not do much damage since Standard had no finished products to ship and had back orders that needed to be filled. A lot of times customers would cancel big orders. She estimated 30 percent of Standard’s orders were never completed. Standard always discounted its prices more than its competitors before and after the Chapter XI proceedings. After examining the price sheets, she stated that the prices actually went up in February 1969. The company discounted greater than its competitors due to the poor quality and lack of quantity of its merchandise. Standard lost many customers due to non-availability of products.
John Stout was the witness whose testimony most impressed the trial court. A certified public accountant who had examined the plaintiff’s exhibits and tax returns, he testified that Standard was suffering a downward trend in net sales from 1967 to 1969. Analyzing this steady decline in sales, Mr. Stout saw nothing alarming about the drop in sales for the first quarter of 1969, especially considering that the company was in corporate reorganization. He explained that corporate reorganization will affect the operation of a business and a decline in sales would be expected. The net sales from 1967 to 1968 declined at an estimated rate of 17.09 percent. Using this rate of decline, Mr. Stout determined that the anticipated net sales of 1969 would have been $1,968,000. This figure did not take into account the corporate reorganization, the move to Louisiana in 1968, or the effect of the phone loss. Mr. Stout then subtracted from this figure the net sales by the company in 1969, and determined that the company had suffered a loss in sales for that year of $99,593. Then he subtracted the cost of manufacturing, materials and other costs, and concluded that the company had an unexplained loss in net revenue of $13,200 for 1969.
Since by the time the phones were disconnected the corporate move to Louisiana was completed and its effects on the financial condition of the company should have been over, it appears reasonable to us to explain the $13,200 loss for 1969 as having been caused by the combined effects of the corporate reorganization and the disconnected phones.
Other evidence at trial revealed that Standard owed numerous creditors prior to filing its. Chapter XI proceedings. Tax liens in excess of $140,000 had been filed against it. The company was behind in its *1148 obligations to the Town of Opelousas as well as to the phone company.
A trial court’s findings of fact and credibility evaluations are entitled to great weight and will not be disturbed on appeal unless shown to be clearly wrong. Canter v. Koehring Company, 283 So.2d 716 (La. 1973); Sauce v. Williams, 434 So.2d 613 (La.App. 3rd Cir.1983).
In the present case it is obvious that the trial court accepted the testimony of defendant’s witnesses as being the more credible, and found that the defendant’s wrongful disconnection of the plaintiff’s phones for four days was not the major cause in the company's drop in sales. We firmly agree with this conclusion. The evidence clearly shows that the company was in financial difficulty before the filing of the Chapter XI proceedings. According to the exhibits and the defendant’s witnesses the company was suffering a steady decline in business before and after the wrongful disconnection, due to unavailability of products and due to the poor quality control. The move to Louisiana and the filing of the Chapter XI proceedings were also factors in the company’s decline in sales. Considering this steady decline in sales, the trial court was correct in accepting Mr. Stout’s analysis of the company’s loss in revenues for 1969. Mr. Stout found that the company suffered an unexplained loss of revenue (not attributable to the company’s steady decline over the past months) in the amount of $13,200 for 1969. This figure did not take into account the damage suffered as a result of the reorganization of the company. As stated earlier, it is reasonable to believe that the reorganization accounted substantially for the loss.
The trial court determined that Vio th of this figure was attributable to the damage suffered by the company as a result of defendant’s wrongful disconnection of phone service. A reviewing court cannot disturb a trial court’s award unless there has been a clear abuse of discretion. Moreland v. Brasseaux, 445 So.2d 1236 (La.App. 3rd Cir.1984). Considering the testimony of Mr. Courville and Mrs. Wyble that the losses resulting from the disconnected phones lasted no more than two or three weeks, and that the estimate of the unexplained loss of $13,200 in 1969 was for a whole year, the trial court’s decision to base the award on one-tenth of that loss, or $1,320 was, far from being an abuse of discretion, actually a commendable solution to this most difficult case.
For these reasons the judgment is affirmed at appellant’s costs.
AFFIRMED.